UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIE CURTIS #492630 and
ARDIS ASHLEY #787145,

    Plaintiffs,                                        Hon. Hala Y. Jarbou

v.                                                        Case No. 1:22-cv-610

HEIDI WASHINGTON, et al.,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiffs Willie Curtis and Ardis Ashley are prisoners currently incarcerated with the Michigan Department of Corrections (MDOC). Plaintiffs filed their complaint in this action pursuant to 42 U.S.C. § 1983 on July 5, 2022, alleging that their placement in the Start Program at ICF violated their rights under the First, Eighth, and Fourteenth Amendments. Plaintiffs sued the following Defendants: (1) Heidi Washington, the Director of the MDOC; (2) Jeremy Bush, the Deputy Director of the MDOC; (2) John Davids, the Warden of ICF; (3) Dale Bonn, the Assistant Deputy Warden of ICF; (4) Gary Ferguson, the inspector at ICF; (5) David Maranka, the Mental Health Unit Chief at ICF; (6) Andrew Eastham, a social worker at ICF; (7) Edward Pietrzyk and Patrick Sanborn, prison counselors at ICF; and (8) Jeff Luther, a resident unit manager at ICF.

Now before me is Defendants' Motion for Summary Judgment. (ECF No. 87.) The motion is fully briefed and ready for decision. Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that Defendants' motion be **GRANTED** and that the complaint be **dismissed with prejudice**.

## I. Background

Plaintiffs allege that they have been diagnosed with mental illnesses, and in May 2022, they were transferred to ICF for treatment of those illnesses in the Start Program. (ECF No. 1 at PagID.5–6; ECF Nos. 1-1 and 1-2.) Director's Office Memorandum (DOM) 2022-12 (eff. Jan. 1, 2022), describes the Start Program—an alternative to administrative segregation—as follows:

> The Department is in the process of piloting general population Start Units as an alternative placement for eligible prisoners who would otherwise be classified to Administrative Segregation. These units provide a structured environment where prisoners move through progressive levels as the prisoner demonstrates positive behavior and program participation with the goal of reintegrating them back into a traditional general population setting. . . .
>
> The targeted population groups for placement in a Start Unit are:
>
> - Prisoners who have been diagnosed with serious mental illness, as defined by Mental Health Services policy, procedure and protocol, whose disruptive behavior would warrant reclassification to administrative segregation.
>
> - Prisoners who refuse to return to a traditional general population setting that has resulted in extended administrative segregation placement.
>
> - Prisoners who have a history of repeated disruptive behavior, who would otherwise be classified to administrative segregation for new negative behavior.
>
> - Other prisoners who would benefit from placement in the Start Unit based on their disruptive behavior, as approved by the CFA Deputy Director or designee. This may include prisoners who are within one year of their discharge date or who have received positive parole action.
>
> Each prisoner accepted for placement in a Start Unit will be provided intake processing, during which time the prisoner's behavioral history and program needs will be reviewed to develop the prisoner's individualized Start Plan. The Start Plan shall clearly define behavioral benchmarks for increased privileges and programs for the prisoner while housed in a Start Unit.
>
> After intake processing, there are four stages through which prisoners may progress while in a Start Unit. Stage 0 is the most restrictive and Stage 3 is the least restrictive. A prisoner's progression within a Start Unit will be based on the individual prisoner's behavior at each stage and subject to recommendations made by the housing unit team and Security Classification Committee (SCC).

> Prisoners in a Start Unit may participate in all activities and services provided to prisoners in a traditional general population setting, subject to restrictions to preserve the custody and security of the facility. This may include restrictions on group activities and activities that require the mass movement of prisoners. Activities that are traditionally provided to general population prisoners in a group setting, or that require mass movement, may instead be provided to these prisoners in the housing unit, the prisoner's cell, or in another specifically designated area of the institution. Activities also may be provided at specifically designated times or under escort, as needed. Personal property also may be restricted or used as an incentive for progression through Start Unit stages.

(ECF No. 88-3 at PageID.573–74; *see also* ECF No. 88-2 at PageID.568–69.)

Plaintiffs arrived at ICF on May 10, 2022. (ECF No. 88-4 at PageID.578–79; ECF. No. 88-5 at PageID.590.) Plaintiff Curtis was initially placed in segregation Unit 1, and entered Start Unit 2 on June 3, 2022, where he remained (except for one day when he went to Unit 3) until he was transferred out of ICF on October 5, 2023. (*Id.* at PageID.566; ECF No. 88-4 at PageID.578–80.) Plaintiff Ashley entered Start Unit 2 on June 3, 2022, and was transferred to Start Unit 3 on August 30, 2022. (ECF No. 88-2 at PageID.570; ECF No. 88-5 at PageID.592.) He returned to Start Unit 2 on September 22, 2022, where he remained until February 6, 2023. (*Id.* at PageID.593.) Ashley was then transferred to Unit 5—a general population unit—where he remained until March 17, 2023, when he was transferred to segregation. (ECF No. 88-2 at PageID.570; ECF No. 88-5 at PageID.593.) Ashley remained in segregation until he was transferred out of ICF on June 22, 2023. (*Id.*) Ashley returned to ICF on December 21, 2023. (*Id.* at PageID.590.) As of February 26, 2024, he was housed in Unit 4, which is not a Start unit. (ECF No. 88-2 at PageID.570.)

## II. Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty*

3

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.  Discussion

#### A.    Official Capacity Claims—Monetary Relief

Plaintiffs have sued all Defendants in both their official and individual capacities. Defendants contend that Plaintiffs' claims against them for money damages in their official capacities must be dismissed as barred by the Eleventh Amendment. This argument is correct. Those claims are subject to dismissal. An official capacity suit is no different than a suit against the state itself. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity.") Because the Eleventh Amendment prohibits suits for damages against states in federal court, *see Quern. v. Jordan*, 440 U.S. 332, 342 (1979), damage claims against state officials in their official capacities are also barred by the Eleventh Amendment. *See Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (noting that Eleventh Amendment immunity "applies to actions against state officials sued in their official capacity for money damages") (citing *Lapides v Bd. of Regents*, 535 U.S. 613, 616, 623 (2002)). Therefore, regardless of the outcome of Plaintiffs' individual capacity claims, their official capacity claims for money damages must be dismissed.

### B. Individual Capacity Claims

As for Plaintiffs' individual capacity claims, Defendants contend that they are entitled to qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant violated a right so clearly established "that every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

#### 1. Free Exercise Clause Violation

Plaintiffs contend that Start Program restrictions on religious practices precluded them from freely exercising their religion in violation of the First Amendment. (ECF No. 1 at PageID.6, 12.) In particular, Plaintiffs contend that they were denied the right to participate in group religious practices and instead were required to participate in religious services while in individual

5

security modules in the day room. (*Id.* at PageID.12; ECF No. 88-2 at PageID.571; ECF No. 88-4 at PageID.584; ECF No. 88-5 at PageID.596.)

It is well established that a prisoner does not forfeit all of his constitutional rights, including his right to free exercise of religion. *See Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (stating that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty"). On the other hand, it is well established that incarceration legitimately requires restrictions on many rights and privileges that prisoners retain. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

> [S]uch a standard is necessary "if prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union*, 433 U.S. [119,] 128, 97 S. Ct. [2532, 2539 (1977)]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. [396], 407, 94 S. Ct. [1800, 1808 (1974)].

*Turner v. Safley*, 482 U.S. 78, 89 (1987). In other words, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), as operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

In *Turner*, the Court articulated four factors to assess the reasonableness of a prison regulation: (1) whether there is a valid, rational connection between the prison regulation and the

6

legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact accommodation of the asserted constitutional right will have on prison staff and inmates; and (4) whether there are other readily available alternatives at a de minimis cost to valid penological interests. *Id.* at 89–91. This standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001) (quoting *Turner*). Instead, the issue is simply whether the policy at issue is reasonably related to a legitimate penological interest. *Id.* Plaintiffs must show that the regulation, as applied by each Defendant, was not reasonably related to legitimate penological objectives. *Murphy v. Karber*, No. 1:14-cv-269, 2017 WL 4160949, at *13 (W.D. Mich. Sept. 20, 2017) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")).

       In support of their motion, Defendants have articulated a rational connection between the policy of requiring Start Program prisoners to participate in religious services while confined to individual security modules and a legitimate penological interest. That is, prisoners confined to segregation are not permitted to engage in group religious services. MDOC Policy Directive 04.05.120 ¶ BB (effective June 1, 2019). Because the purpose of the Start Program is to facilitate segregation prisoners' transition back into general population (ECF No. 88-2 at PageID.569), allowing prisoners to participate in religious services in a manner that is less restrictive than permitted in true segregation but more restricted than what is permitted in the general population serves this purpose while still protecting staff and other prisoners during this time of transition.

7

Plaintiffs fail to respond with evidence showing that the restriction on participation in group religious services is invalid under *Turner*. *See O'Lone*, 482 U.S. at 350–53 (upholding as reasonably related to legitimate penological concerns prison regulations that rendered Muslim prisoners unable to attend weekly Jumu'ah services in the face of the plaintiffs' free-exercise challenge). The second through fourth *Turner* factors all weigh in Defendants' favor, as Plaintiffs fail to identify any other readily available alternatives that would not present a security risk to prison staff and other inmates or would not hamper prison officials' ability to manage mentally-ill prisoners while furthering the goals of the Start Program.[1] Accordingly, I recommend that Defendants are entitled to summary judgment as to Plaintiffs' First Amendment free-exercise claim because Plaintiffs fail to create a genuine issue of material fact as to the validity of the group-religious-services restriction under *Turner*. In addition, because Plaintiffs fail to identify a case clearly establishing that the restriction at issue is unconstitutional, Defendants are also entitled to qualified immunity.

### 2. Access to the Courts

Plaintiffs next contend that Defendants violated their First Amendment right to access to the courts by denying them the ability to attend law library sessions and to access a Lexis-Nexis computer. (ECF No. 1 at PageID.12–13; ECF No. 88-4 at PageID.581; ECF No. 88-5 at PageID.595–96.) According to Defendant Maranka, prisoners in the Start Program must access the law library through a kite system by which they can request that the prison librarian provide them

---

[1] In their complaint, Plaintiffs allege that denying them group religious services violates "the Curtis-case," 1:22-cv-163 (W.D. Mich.) (ECF No. 1 at PageID12.) The case Plaintiffs cite contains no such holding. Instead, review of the docket report in that case discloses that Magistrate Judge Kent dismissed it because Plaintiff Curtis failed to provide the required number of copies for service by the United States Marshal. Case No. 1:22-cv-163, ECF No. 20.

requested legal materials. (ECF No. 88-2 at PageID.570.) This is the same policy that applies to prisoners in segregation. (*Id.*)

An inmate has a constitutional right to meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 823 (1977); *Knop v. Johnson*, 977 F.2d 996, 1002–03 (6th Cir. 1992). However, this right is not unrestricted and does not mean that prison officials must afford inmates unlimited litigation resources. *See Lewis v. Casey*, 518 U.S. 343, 352–55 (1996). The right of access to the courts has never been equated to unlimited access to legal materials and assistance. *See Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir. 1985) (noting that the right at issue is access to the courts, not access to law libraries). To establish a claim for denial of access to the courts, a prisoner must demonstrate actual prejudice to pending or contemplated litigation. *Id.* at 351. In other words, a prisoner must allege that he suffered "an actual litigation related injury or legal prejudice because of the actions of the defendants." *Erdman v. Martin*, 52 F. App'x 801, 803 (6th Cir. 2002) (citing Lewis, 518 U.S. at 349–51). A prisoner must make a specific claim that he was adversely affected or that the litigation was prejudiced. *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005). Examples of actual prejudice include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline. *Lewis*, 518 U.S. at 351; *Harbin-Bey*, 420 F.3d at 578.

Defendants contend that they are entitled to summary judgment on this claim because Plaintiffs cannot demonstrate prejudice. First, they note that Plaintiff Curtis contends that a case he filed in this Court, *Curtis v. Burgess*, No. 1:22-cv-163 (W.D. Mich.), was dismissed due to his inability to access the law library. Defendants contend, however, that the docket report in that case shows that it was dismissed because Curtis failed to provide the requisite number of copies required for the Marshal to execute service on the defendants. Case No. 1:22-cv-163, ECF No. 20. Although Curtis filed a motion to alter or amend the judgment arguing that he had submitted a

9

letter setting forth his "excuse for non-copies" in Case No. 1:22-cv-610—the present case—Magistrate Judge Kent denied the motion because his review of the docket in that case revealed that Curtis never submitted an excuse for his failure to provide copies. Instead, Magistrate Judge Kent noted that Plaintiff had provided sufficient copies for service in this action. *Id.*, ECF No. 27.

Defendants also note that Curtis claims that the library policy resulted in dismissal of another action he filed in this Court, *Curtis v. Burgess*, Case No. 1:22-cv-266, but Magistrate Judge Green's report and recommendation in that case shows that Curtis failed to respond to the defendants' motion for summary judgment. Case No. 1:22-cv-266, ECF No. 37. Defendants also note that nothing in the record of that case indicates that Plaintiff Curtis raised the issue of inability to access the law library to the Court as an excuse for failure to respond to the motion.

As for Plaintiff Ashley, Defendants note that he testified that the law library policy affected his ability to litigate *Ashley v. Burgess*, Case No. 1:22-cv-145 (W.D. Mich.). Defendants further note that in his January 25, 2024 deposition, Ashley admitted that, at the time, the case had not been dismissed but was ongoing. (ECF 88-5 at PageID.595.) Subsequently, Magistrate Judge Kent recommended that the case be dismissed for lack of exhaustion, which Judge Maloney adopted on April 23, 2024. Case No. 1:22-cv-145, ECF Nos. 36–39. Significantly, Plaintiff Ashley did not respond to the motion for summary judgment, nor did he file an objection responding to the report and recommendation.

I recommend that Defendants be granted summary judgment on Plaintiffs' access-to-the courts claim because they fail to show actual prejudice as a result of the library access policy. As noted, Plaintiff Curtis's lawsuits were dismissed because he failed to provide sufficient copies of the complaint for service and because he failed to respond to the defendants' motion for summary judgment. He offers no reason why the law library policy caused the dismissal of his actions.

10

Similarly, Plaintiff Ashley fails to demonstrate actual prejudice to his ability to litigate his civil rights case in this Court. As noted, his case was dismissed because he failed to respond to the defendants' motion for summary judgment based on lack of exhaustion. Thus, both Plaintiffs' claims are subject to dismissal.

### 3. Eighth Amendment Claim

Plaintiffs contend that Defendants violated their Eighth Amendment rights to treatment for their serious medical needs by failing to provide them adequate mental health treatment while in the Start Program. The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations that occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Punishment that is without penological justification or involves the unnecessary and wanton infliction of pain also violates the Eighth Amendment's proscriptions. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In other words, the Eighth Amendment prohibits "the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

The unnecessary and wanton infliction of pain encompasses "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). Determining whether denial of medical care amounts to an Eighth Amendment violation involves two steps. First, the court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need" sufficient to implicate the Eighth Amendment is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Thus, the objective component is satisfied where a prisoner receives no treatment for a serious medical need. *See Rhinehart v. Scutt*,

11

894 F.3d 721, 737 (6th Cir. 2018). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier*, 238 F.3d at 742 (internal quotation marks omitted). When a plaintiff claims that care he received was inadequate, he must demonstrate that his doctor rendered grossly incompetent treatment. *Rhinehart*, 894 F.3d at 737. To meet this standard, the plaintiff must "present expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so." *Phillips v. Tangilag*, 14 F.4th 524, 536 (6th Cir. 2021) (citing *Jones v. Muskegon Cnty.*, 625 F.3d 935, 945–46 (6th Cir. 2010)).

If the plaintiff satisfies the objective component, he must then demonstrate that the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847). To satisfy this part of the analysis, the plaintiff must demonstrate that the defendant acted with "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005).

As noted, Plaintiffs contend that the mental health treatment they received in the Start Program was inadequate. (ECF No. 88-4 at PageID.582.) Plaintiff Ashley contends that the MDOC should have provided him group therapy while in a Start unit. (ECF No. 88-5 at PageID.597.) In

his declaration, Defendant Maranka describes the mental health services available to Plaintiffs while in the Start Program. First, a qualified mental health professional visited Plaintiffs at least once per month, and the Security Classification Committee met with them monthly to review their progress. (ECF No. 88-2 at PageID.570.) In addition, Plaintiffs, like prisoners in the general population, were able to request mental health services by submitting a kite or speaking with custody staff. In addition, Plaintiffs were able to request mental health services from nurses making daily rounds. (*Id.*)

Plaintiffs fail to establish an Eighth Amendment violation because their claims are based on nothing more than their disagreement with the treatment they received. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). "[A] difference in opinion between a prisoner and the medical staff about treatment does not state a cause of action." *Kirkham v. Wilkinson*, 101 F. App'x 628, 630 (6th Cir. 2004) (citing *Estelle*, 429 U.S. at 107); *see also Owens v. Hutchinson*, 79 F. App'x 159, 161 (6th Cir. 2003) (stating that "[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). Moreover, as stated in *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014), "a desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." In short, Plaintiffs present no evidence showing that the mental health care they received was "so woefully inadequate as to amount to no treatment at all." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake*, 537 F.2d at 860 n.5). Accordingly, Plaintiffs' Eighth Amendment claim is properly dismissed as to all Defendants.

####     4.       Equal Protection Claim

Plaintiffs also contend that the Start Program violates their right to equal protection under the Fourteenth Amendment. In particular, they claim that, unlike general population prisoners, they must be escorted in handcuffs wherever they go, do not receive out-of-cell activity time, are not allowed holiday bags, and must be accompanied by a corrections officer during healthcare visits or mental health sessions. (ECF No. 88-4 at PageID.583; ECF No. 88-5 at PageID.598–99.)

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Prisoners are not considered a suspect class for purposes of the Fourteenth Amendment. *Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir. 1998) (citing *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997)). Therefore, differentiation among prisoners "is permissible as long as even a rational basis for the differing treatment can be shown." *Id.* (citing *United States v. Kras*, 409 U.S. 434, 46 (1973)).

Here, a rational basis exists for imposing greater security and personal property restrictions on prisoners in the Start Program—a transitional program for prisoners confined in segregation—than on general population prisoners because such restrictions are justified by the need to manage prisoners who present safety and security concerns. *See Williams v. Pratt*, No. 105CV391, 2005 WL 1923594, at *3 (W.D. Mich. Aug. 11, 2005) (observing that "it unquestionably is reasonable for the prison to place limitations on the possession of personal property for [segregation] offenders, either for punitive purposes or to manage the threat created by prisoners who are not

14

able to be managed in the general prison population") (citing, among others, *Williams v. Vidor*, 67 F. App'x 857, 860 (6th Cir. 2003) (holding that the plaintiff's placement in administrative segregation did not violate his equal protection rights because the segregation was rationally related to the prison's legitimate interest in maintaining security)). Because Plaintiffs fail to demonstrate that the Start Program restrictions that Defendants applied to them lack a rational basis, Defendants are entitled to summary judgment on this claim.

### 5.     Due Process Claim

In their final claim, Plaintiffs contend that Defendants violated their right to due process by failing to follow the MDOC's rules pertaining to the Start Program. (ECF No. 1 at PageID.16; ECF No. 88-4 at pageID.585; ECF no. 88-5 at PageID.597.)

The Fourteenth Amendment protects an individual from deprivation of life, liberty, or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient. . . ." *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

Here, Plaintiffs fail to identify a liberty or property interest that might support a due process claim. "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 579 (1972)). Plaintiffs may not maintain a due process claim based on Defendants' failure to follow Start Program policy or procedure because they have no liberty or property interest in such rules or procedures. *See Barber v. City of*

15

*Salem*, 953 F.2d 232, 240 (6th Cir. 1992), *abrogation recognized on other grounds*, *Lawler ex rel. Lawler v. Hardeman Cnty.*, 93 F.4th 919, 927 (6th Cir. 2024) ("[F]ailure to comply with a state regulation is not itself a constitutional violation." (citing *Roberts v. City of Troy*, 773 F.2d 720, 724–25 (6th Cir. 1985)); *Jones v. Smolinski*, No. 1:09-cv-633, 2009 WL 3352804, at *4 (W.D. Mich. Oct. 13, 2009) ("Because Plaintiff does not enjoy any federally protected liberty or property interest in state procedure, he fails to state a due process claim based on Defendant Smolinski's refusal to follow MDOC policy.") (citing *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)). Because Plaintiffs fail to identify any other basis for a liberty or property interest supporting a due process claim, I recommend that the Court grant Defendants summary judgment on this claim as well.[2]

## IV.   Conclusion

For the reasons set forth above, I recommend that the Court **grant** Defendants' motion for summary judgment (ECF No. 87), and **dismiss** Plaintiffs' complaint **with prejudice**.


Dated: May 14, 2024                                        /s/ Sally J. Berens
                                                           SALLY J. BERENS
                                                           U.S. Magistrate Judge

## NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

---

[2] Requests for declaratory and injunctive relief are remedies rather than causes of action. *See Friess v. City of Detroit*, No. 17-14139, 2019 WL 1379865, at *9 (E.D. Mich. Mar. 27, 2019). Accordingly, given the foregoing recommendations to grant summary judgment on all claims, I need not address Defendants' arguments pertaining to the availability of declaratory and injunctive relief in this action.